AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

> **LODGED**
> CLERK, U.S. DISTRICT COURT
> 8/24/2023
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ jb _____ DEPUTY

United States of America

v.

ADRIAN FLORES,

Defendant.

Case No.    2:23-mj-04354-duty

> **FILED**
> CLERK, U.S. DISTRICT COURT
> August 24, 2023
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ CLD _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 22, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Elizabeth Cardenas, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    August 24, 2023

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Elizabeth Douglas, x5728

## AFFIDAVIT

I, Elizabeth Cardenas, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against ADRIAN FLORES ("FLORES") for a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearms and Ammunition).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Long Beach Police Department, in Long Beach, California, as described more fully in Attachment A:

        a.    A black Samsung cellular phone, IMEI 356184990466783 ("SUBJECT DEVICE 1"); and

        b.    A black Samsung Tablet ("SUBJECT DEVICE 2").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.   I am a Special Agent with the FBI and have been so employed since January 2019.  As an FBI agent, I am authorized to investigate violations of United States law and execute warrants issued under the authority of the United States.  I am currently assigned to the Violent Crime squad at the FBI Long Beach Resident Agency.  My training includes a wide array of investigative techniques, operational skills, firearms, tactics, case management, cybersecurity and interview and interrogation training.  My responsibilities include investigating violent street gangs, firearms and narcotics cases, armed bank robberies, crimes against children, extortion and kidnapping in the Central District of California.  I have also received specialized training and instruction related to these matters.

6.   As an FBI Special Agent, I have participated in numerous federal and state investigations and, through my participation in these investigations, I have interviewed

numerous witnesses, cooperating sources, and defendants.  During
my time with the FBI, I have executed numerous search warrants
related to various crimes, including felon in possession cases.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On August 22, 2023, Long Beach Police Department
("LBPD") officers responded to a call reporting a white pickup
truck ("the White Pickup") blocking the caller's driveway on
Maine Avenue in Long Beach, California.  When the LBPD officers
arrived and approached the White Pickup, they saw a man -- later
identified as FLORES -- slumped over near the steering wheel.
FLORES appeared to be asleep or unconscious.

8.    An LBPD officer tapped on the driver's side window of
the White Pickup trying to wake FLORES up.  Once FLORES woke up,
the LBPD officer asked FLORES to roll down his window and to
provide his driver's license.  FLORES rolled down the window
and, as FLORES reached towards his right waistband/rear pocket
area, the LBPD officer heard a clicking sound similar to a
handgun being removed from a holster, or a safety being released
from a handgun.  At that point, the officer asked FLORES to put
his hands on the steering wheel.

9.    After FLORES complied, the officer walked around the
White Pickup to look for a license plate.  Upon returning to the
driver's side-door area, the officer observed what appeared to
be a firearm silencer between FLORES' thighs.  LBPD officers
then removed FLORES from the White Pickup to place him under
arrest.  While doing so, one of the officers noticed in plain
view a black semi-automatic firearm (the "Black Handgun") just

underneath the driver's seat and a matching magazine next to the Black Handgun.  As the officers removed FLORES from the vehicle, both SUBJECT DEVICES fell out of FLORES' lap.

10.  LBPD officers searched FLORES and found: a magazine containing seven rounds of 9mm ammunition, and a Blackhawk magazine pouch clipped onto his hip; an expanding baton in his jacket; and a counterfeit California Highway Patrol ("CHP") badge in his pants pocket.

11.  LBPD officers then searched the White Pickup and found additional items, including two high-capacity magazines containing 25 or more rounds of 9mm ammunition and a Blackhawk handgun holster.

12.  After LBPD arrested FLORES on state charges, LBPD obtained a state search warrant for FLORES' residence and found evidence of suspected firearms and drug trafficking.  Inside FLORES' house, LBPD officers found 12 additional firearms, 6 suspected firearm silencers, a significant amount of ammunition, firearm smithing tools and parts, multiple plastic baggies containing suspected methamphetamine, and a digital scale.

13.  FLORES has an extensive and violent criminal history that includes convictions for drug trafficking and gun offenses, as well as crimes of violence (assault with a deadly weapon and assault causing great bodily injury).

## IV. STATEMENT OF PROBABLE CAUSE

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.    **LBPD Finds a Gun, High-Capacity Magazines, Ammunition, Suspected Silencer, and SUBJECT DEVICES 1 and 2 on FLORES and in His Vehicle**

15.    Based on my review of law enforcement reports, photographs, and my conversations with LBPD officers, I am aware of the following:

a.    On August 22, 2023, LBPD officers responded to a call reporting the White Pickup blocking the caller's driveway on Maine Avenue in Long Beach, California.  A records check of the vehicle showed it was registered to FLORES at 3057 Golden Avenue, Long Beach, California, 90806.

b.    When the LBPD officers arrived and approached the White Pickup, they saw a man --later identified as FLORES -- slumped over near the steering wheel.  FLORES appeared to be asleep or unconscious.  An LBPD officer tapped on the driver's side window of the White Pickup several times trying to wake FLORES up.  Eventually, FLORES woke up.

c.    Once FLORES woke up, the LBPD officer asked FLORES to roll down his window and to provide his driver's license.  FLORES rolled down the window and, as FLORES reached towards his right waistband/rear pocket area, the LBPD officer heard a clicking sound similar to a handgun being removed from a holster, or a safety being released from a handgun.  At that point, the officer asked FLORES to put his hands on the steering wheel and requested backup.

d.    While waiting for backup to arrive, the officer walked around the White Pickup looking for a license plate. Upon returning to the driver's side-door area, the officer

observed what appeared to be a firearm silencer between FLORES'
thighs.  Officers then removed FLORES from the White Pickup to
place him under arrest.  While doing so, one of the officers
noticed in plain view the Black Handgun -- a black Glock 19, 9mm
semi-automatic handgun, bearing serial number YHH433, with a
threaded barrel and tactical light -- on the driver's floorboard
just underneath the driver's seat. The officer also saw a Glock
magazine, containing 15 rounds of 9mm ammunition next to the
Black Handgun.  In addition, as the officers removed FLORES from
the vehicle, both SUBJECT DEVICE 1 and SUBJECT DEVICE 2 fell out
of FLORES' lap.

     e.  Upon conducting a search incident to arrest of
Flores' person, officers found:

        i.  A Glock high-capacity magazine containing
seven 9mm rounds of ammunition in a plastic holster on FLORES'
hip;

        ii.  A Blackhawk magazine pouch, also on FLORES'
hip;

        iii. A metal expandable baton in FLORES' right
front jacket pocket; and

        iv.  A counterfeit CHP badge.

     f.  When searching the White Pickup, prior to it
being towed, LBPD officers found (in addition to the Black
Handgun, loaded magazine, and silencer already discovered): two
Glock high-capacity magazines, one of which contained 25 9mm
rounds of ammunition and one of which contained 30 9mm rounds of
ammunition; and a Blackhawk holster for a handgun.

> **B.    LBPD Finds 12 Firearms, 6 Suspected Silencers, 10 Magazines, Ammunition, Firearm Tools and Parts, and Suspected Drugs in FLORES' Residence**

16.    Based on my conversations with LBPD officers, I am aware of the following:

a.    Following FLORES' arrest on state charges, LBPD officers obtained a state search warrant from the Honorable Laura Laesecke, Superior Court of California, County of Los Angeles, for FLORES' residence at 3057 Golden Avenue, Long Beach, California.

b.    LBPD officers executed that search warrant on August 22, 2023.  FLORES' sister, who also resides at the residence, identified for LBPD officers FLORES' living space, which included his bedroom and attached rooms in a converted garage.

c.    In FLORES' bedroom and rooms attached to his bedroom found evidence of firearms manufacturing and trafficking including 12 firearms, 6 suspected silencers, 10 magazines, numerous rounds of ammunition, firearms parts, and gunsmithing tools.  LBPD officers also found evidence of drug trafficking including multiple plastic baggies containing suspected methamphetamine and a digital scale.

d.    Specifically, on FLORES' bed, LBPD officers found a magazine containing ammunition and two loose 9mm rounds of ammunition.

e.    Near or under FLORES' bed, LBPD officers found:

i.   An AR-15 style rifle, with an attached light
and suspected silencer, loaded with a magazine containing
ammunition, as depicted below;



ii.  Two empty magazines, a 3D printed lower
receiver for a semi-automatic pistol, and a Dremel hand tool
believed to be utilized in firearm gunsmithing located in a
wagon at the foot of the bed; and

iii. A round of 9mm ammunition underneath the bed.

    f.   On the nightstand, LBPD officers found a suspected firearm silencer, parts commonly associated with silencers, and two empty magazines.

    g.   In the bedroom closet, LBPD officers found:

    i.   A Sporting Arms Company "Snake Charmer" .410 caliber rifle, bearing serial number 62429;

    ii.  A bolt-action rifle, bearing letters HMN22 on the stock of the rifle;

    iii. A Colt revolver;

    iv.  Three suspected firearm silencers;

    v.  Two rifle handguards, one pistol magazine, and one trigger mechanism; and

    vi.  A large quantity of miscellaneous ammunition.

    h.   Near the bedroom closet, LBPD officers also found:

    i.   A revolver, bearing serial number B19666; and

    ii.  A revolver, bearing serial number F558, missing its cylinder;

    iii. A large quantity of miscellaneous ammunition; and

    iv.  A single round of 9mm ammunition inside of a "Glock" brand box located underneath an ottoman near the closet.

       i.   Along the walls of the bedroom, in the corners, and elsewhere in the bedroom, LBPD officers found:

          i.   A Ruger .22 caliber rifle, bearing serial number 91993, with a suspected silencer;

          ii.  A Glock 19 handgun, bearing serial number #XXE751 with an unserialized lower receiver;

          iii. A Smith & Wesson revolver with wooden grips, missing its barrel;

          iv.  A semi-automatic pistol frame and lower receiver of an AR-15 style rifle; and

          v.   Numerous magazines, firearm accessories, spent firearms cartridges, and additional ammunition.

       j.   LBPB also found, in the laundry room attached to FLORES' bedroom a box of Winchester Ammunition and multiple gunsmithing tools.

       k.   LBPD officers also found evidence of drug trafficking in FLORES' bedroom, including multiple plastic baggies containing suspected methamphetamine, as well as a digital scale on the bed.

    **C.**    **FLORES Is a Convicted Felon**

17.  On August 22, 2023, I reviewed FLORES criminal history and learned that FLORES has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

       a.   On or about May 25, 2017, a violation of California Penal Code 245(a)(4), Assault by Means Likely to

Produce Great Bodily Injury, in the Superior Court for the State of California, County of Los Angeles, Case Number NA10562901;

b.    On or about March 27, 2014, a violation of California Penal Code 29800(A)(1), Possession of a Firearm by a Prohibited Person, in the Superior Court for the State of California, County of Los Angeles, Case Number NA09862501;

c.    On or about March 27, 2014, a violation of California Health and Code 11379(A), Selling or Transporting Controlled Substance, in the Superior Court for the State of California, County of Los Angeles, Case Number NA09862501;

d.    On or about September 9, 2005, a violation of California Penal Code 245(a)(2), Assault with a Firearm in the Superior Court for the State of California, County of Los Angeles, Case Number NA06481301; and

e.    On or about February 13, 2004, a violation of California Penal Code 245(a)(1), Assault with a Deadly Weapon without a Firearm with Great Bodily Injury in the Superior Court for the State of California, County of Los Angeles, Case Number NA05791401.

**D.    Interstate Nexus**

18.    On August 23, 2023, FBI Special Agent James Yun, a Firearms Interstate Nexus Expert examined the handgun and confirmed that the handgun was manufactured outside of the State of California.  Because the handgun was found in California, I believe that it has traveled in and affected interstate commerce.

## V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

19.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

    d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

<u>**TRAINING AND EXPERIENCE ON DRUG OFFENSES**</u>

20.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

      c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

      e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

1.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

2.    Based on my training, experience, and information from those involved in the forensic examination of digital devices,

I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

3.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

21.  For all of the reasons described above, there is probable cause to believe that FLORES has committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearms and Ammunition).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of
August 2023.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE